**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KENDRIA MCDANIEL,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:14-CV-0122** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **OHIO DEPARTMENT OF** | : | |
| **REHABILITATION AND CORRECTION,** | : | **Magistrate Judge King** |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

## I.     INTRODUCTION

This matter is before the Court on Defendant Ohio Department of Rehabilitation and Correction's ("DRC") Motion for Summary Judgment. (Doc. 26.) Plaintiff Kendria McDaniel was employed as a Corrections Officer at Madison Correctional Institution ("MaCI") before taking disability leave in September 2013. (Compl., Doc. 1 at 2.) She filed claims against DRC under Title VII of the Civil Rights Act of 1964 ("Title VII") for race and sex discrimination; retaliation; and hostile work environment on the basis of race and sex; as well as claims for unlawful invasion of privacy and assault under Ohio law. (*Id.* at 4-6.) Defendant moved for summary judgment on all claims, contending that Plaintiff has failed to make a prima facie case of discrimination, retaliation, or hostile work environment. Defendant also argues that Plaintiff's state-law claims should be dismissed on the ground of sovereign immunity. Plaintiff opposes dismissal of her federal claims. She concedes that her state-law claims should be dismissed and asks the Court to do so without prejudice so that she may refile these claims in the Ohio Court of Claims. For the following reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment on all claims.

1

## II.    BACKGROUND

### A.  Factual History

Plaintiff, an African-American female, worked as a Corrections Officer at MaCI from May 2011 until September 2013.  In March 2013, McDaniel began working under the supervision of Correctional Lieutenant Orlanzo Williams, an African-American male. (McDaniel Dep., Doc. 22 at 33.)  McDaniel and Williams worked in a residential compound, which was divided between Zone A, a unit of cell blocks, and Zone B, a unit of open dormitory-style housing.  (*Id.* at 27.)  Williams supervised both Zone A and Zone B, and floated between the two locations, while McDaniel was permanently stationed at Zone B.  (*Id.* at 40.)  McDaniel recounts that during the beginning of their working relationship, Williams was friendly and approachable and that she was able to discuss work-related issues with him.  (*Id.* at 34-35.)  In July of 2013, their relationship changed.  (*Id.* at 36-37.)  McDaniel stated in deposition that when he learned that she was engaged to a white man, fellow MaCI Corrections Officer Deron Gumm (to whom she had been engaged since August of 2012), Williams began to treat her differently. (*Id.* at 36, 43.)  McDaniel did not believe that she ever directly told Williams that she and Gumm were engaged but she believed that he had found out about the relationship through word-of-mouth at the prison.  (*Id.* at 38.)  Williams stated that he had heard rumors of the relationship and at one point he asked McDaniel directly and she told him that they were engaged.  (Williams Dep., Doc. 24 at 71-72.)  Williams could not recall exactly when this conversation occurred.  (*Id.* at 71.)

McDaniel filed an incident report on July 15, 2013 against Williams after an exchange between the two of them on that day.  (McDaniel Dep., Doc. 22 at 46.)  Zone B included a small room for inmate telephone use located off of the dormitory area that housed the inmates.  The

door was often kept closed because noise from the phone callers is distracting to other inmates in the dormitory.  (McDaniel Aff., Doc. 29-1 ¶ 8.)  At approximately 5:40pm, Williams instructed McDaniel to leave the door to the telephone room open, apparently in order for the air to circulate because it was a warm day and the electricity had been shut off, and she said she had opened the door at his instruction.  (*Id.* at 47, 49.)  Williams re-entered the dormitory in Zone B around 6:35pm and asked McDaniel who had closed the phone room door, to which she replied that she did not know.  (*Id.* at 46-47.)  According to McDaniel, after she said she didn't know who closed the door, Williams told her that he was her supervisor, that he wasn't finished talking to her, and that she was being insubordinate.  (*Id.* at 49.)  McDaniel felt humiliated and "talked down to" in front of the inmates on Zone B, thereby undermining her authority on the unit. (McDaniel Aff., Doc. 29-1 ¶ 9.)

McDaniel and Williams both filed incident reports.  (Incident Report, Doc. 22-1 at 22, 41.)  Warden Rodney Johnson, an African-American male, commenced an investigation into the incident.  (Johnson Dec., Doc. 26-1 ¶ 4.)  When McDaniel was interviewed, she stated that she had closed the door at one point in order to control the inmates on her unit better because some inmates were talking loudly in the phone room.  (McDaniel Dep., Doc. 22 at 51-52.)  She also contended that because the electricity was off and the fans were not working, opening the phone room door would not have actually helped with air circulation.  (McDaniel Aff., Doc. 29-1 ¶ 8.)

On August 23, 2013, Johnson issued McDaniel a written reprimand for failure to follow a verbal directive.  (Johnson Dec., Doc. 26-1 ¶ 5.)  The written reprimand stated the following:

> On July 15, 2013 while working in Jefferson/C, you were given a directive by Lt. Williams to leave the phone room door open due to the extreme heat and power being off.  Lt. Williams then left your unit and you disregarded his directives and took it upon yourself to close the phone room door.  Your actions are a violation of the Department's Standard of Employee Conduct Rule 7 – Failure to follow post orders, administrative

regulations, policies, or written or verbal directives.  Therefore, you are issued a written reprimand.

(Notice of Written Reprimand, Doc. 22-1 at 42.)  This is the only discipline action that McDaniel ever received at MaCI.  (McDaniel Dep., Doc. 22 at 140.)

On July 21, 2013, McDaniel filed a second incident report.  In this report, she mentioned that she had filed a previous "workplace violence report" on July 15, 2013 against Williams. (Incident Report, Doc. 22-1 at 24.)  In the July 21 report, McDaniel stated that she felt "very uneasy" working in the same area as Williams as a result of the previous incident and that on that date, while she was conducting a shake-down of inmates on her unit, Williams did a round of the area and then "doubled back" to where McDaniel was conducting her shakedown.  (*Id.*)  He asked her if everything was all right, and she said yes.  (*Id.*)  McDaniel stated that she felt that Williams intended "to make sure his presence was known and bolster[] at the fact that he was on Zone B."  (*Id.*)

When Johnson received the second incident report, the first incident was still under investigation.  (Johnson Dec., Doc. 26-1 ¶ 5.)  Johnson stated in an affidavit, regarding his reaction upon receiving the second incident report, that Williams's actions as described in the second incident report were "exactly what [he] expect[s] [his] supervisors to do."  (*Id.*)  He further stated that he had previously evaluated whether to separate Williams and McDaniel based on the July 15 report and determined that there was no need to do so.  (*Id.*)  Johnson also directed Deputy Superintendent of Operations, Dennis McHugh, to discuss the incident with Williams and inform him of the report.  (*Id.*; Williams Dep., Doc. 24 at 43-44.)

On August 18, 2013, McDaniel filed a third incident report concerning a staff shakedown that took place on August 14, 2013.  (Incident Report, Doc. 22-1 at 25.)  The Office of Prisons had a policy of conducting at least two unannounced searches per year of all prison staff in order

to prevent the smuggling of contraband into the prison.  (*See* Standardized "Shakedown Protocol," Doc. 22-1 at 30.)

McDaniel was the only woman assigned to the second shift in Zone B that day. (McDaniel Dep., Doc. 22 at 78.)  Lieutenant Greg Harris conducted the staff shakedown using a new metal detector designed to be sensitive to small amounts of metal.  (Harris Dep., Doc. 23 at 16-17.)  Virginia Workman, the Unit Management Chief, assisted in the shakedown.  (Workman Dep., Doc. 25 at 6, 10.)  All officers assigned to Zone B on second shift that day were subject to the shakedown.  (McDaniel Dep., Doc. 22 at 76.)  Harris acknowledged in his deposition that he had no particular reasons to suspect that McDaniel was carrying contraband that day or to treat her differently than any other officer.  (Harris Dep., Doc. 23 at 17.)  When McDaniel set off the metal detector, she removed a necklace but the detector went off a second time.  (*Id.* at 18.)  She realized she was still wearing a ring, which she also took off, but the metal detector beeped a third time.  (McDaniel Dep., Doc. 22 at 77.)  McDaniel suggested that because she was not wearing any other jewelry, it must have been her underwire bra that triggered the detector, and Harris told her that Workman was "here to take care of female staff."  (Harris Dep., Doc. 23 at 18-19; McDaniel Dep., Doc. 22 at 77.)  Harris told McDaniel to go to the restroom.  (*Id.* at 78.) He stated in deposition that his expectation was that Workman would "verify [McDaniel] wasn't concealing anything."  (Harris Dep., Doc. 23 at 19.)  He also stated that it was not his understanding that employees were required to take their shirts off, and such a request would require proper authorization.  (*Id.* at 20.)

Workman followed McDaniel into the restroom.  (Workman Dep., Doc. 25 at 13.)  Here, Workman and McDaniel's stories diverge.  Workman said that when she entered the restroom Ms. McDaniel had already unbuttoned all but the last button of her shirt and had exposed her bra.

(*Id.* at 13-14.) Workman stated: "I looked at the bra. I confirmed to myself that there was an underwire bra. I looked at the clasp." (*Id.* at 13-14.) Workman says she did not touch the straps of the bra but merely touched McDaniel on the shoulder and said thank you before walking out. (*Id.* at 14.) Workman said she had never been given instructions on how to inspect an officer's bra and that this was the first time she had done so. (*Id.* at 15.)

McDaniel, by contrast, says that Workman walked around in front of her, stopped, and instructed her to take off her uniform shirt. (McDaniel Dep., Doc. 22 at 78.) McDaniel handed the uniform shirt to Workman, who felt it to see if there was anything in the pockets. (*Id.* at 81.) She then instructed McDaniel to lift up the t-shirt she was wearing over her bra. (*Id.*) McDaniel lifted up her t-shirt, and Workman looked at the front of her bra, then walked around behind her and pressed the back of her bra strap. (*Id.* at 81.) Workman then stated that she agreed that there was metal in the bra, and she left the restroom. (*Id.* at 82.)

In her incident report, McDaniel stated that she felt "harassed and singled out because no other woman had to reveal themselves." (Incident Report, Doc. 22-1 at 25.) She later claimed that she learned that three female staff members on Zone A had set off the metal detectors but were waved through anyway: Officers Silvers, Powell, and Russell. (McDaniel Dep., Doc. 22 at 86.) McDaniel claimed that the union steward who was assigned to observe the Zone A shakedown conferred with the steward who was assigned to observe the Zone B shakedown, and that the Zone B steward informed McDaniel that these three women had been treated differently than she had been. (*Id.* at 87-88.) McDaniel also maintains that she spoke with the three white officers directly and they told her that they did not clear the metal detector but were waved through by the major who had conducted the shakedown for the staff on Zone A. (*Id.* at 88-89.)

Harris stated that he did not know anything about what happened on Zone A during the shakedown. (Harris Dep., Doc. 23 at 26-27.)

On August 20, 2013, McDaniel filed a grievance regarding the staff shakedown incident pursuant to the collective bargaining agreement between her union and MaCI. (Grievance Form, Doc. 22-1 at 48.) The grievance alleged discrimination on the basis of race because three white females were waved through the metal detector while McDaniel was not. (*Id.*) A hearing officer denied the grievance at step three of the grievance procedure, finding no violation of the contract. (Step 3 Response, Doc. 22-1 at 51.)

McDaniel testified in her deposition that she had no firsthand knowledge that Harris or Workman knew about the previous two incidents between Williams and McDaniel, although she assumed that in the course of his duties Harris would learn about all incident reports received by the warden. (McDaniel Dep., Doc. 22 at 96-98.) There is no other evidence that either Harris or Workman knew about these incidents.

The parties also dispute whether the incident report for the staff shakedown incident was ever filed with the warden. McDaniel maintains that she placed the August 18, 2013 incident report describing the staff shakedown incident in the warden's mailbox and that she had discussed the content of the report during the union grievance procedure. (*Id.* at 94-95.) But Johnson submitted an affidavit stating that he did not have any record of this incident report until he received a complaint from the Equal Opportunity Division of the Ohio Department of Administrative Services on September 13, 2013, which included a copy of the incident report that McDaniel purportedly filed on August 18, 2013. (Johnson Dec., Doc. 26-1 ¶ 9.)

On September 2, 2013, McDaniel filed another incident report listing eight specific dates when Williams was her unit supervisor in which she maintained that he did not speak to her and

did not conduct a proper post check or allow her the opportunity to raise any issues that may have come up on the unit.  (Incident Report, Doc. 22-1 at 26.)  She stated that she considered this treatment to be retaliation for the July 15, 2013 and July 21, 2013 incident reports.  (*Id.*)  One of the eight dates cited as examples of lack of communication and inappropriate supervision, July 21, was also the date when McDaniel had taken issue with Williams doubling back to check on her after her inmate shakedown and asking if everything was all right.  (*See* Incident Report, Doc. 22-1 at 24.)

McDaniel filed the next incident report on September 3, 2013, contending that Williams made a false statement in her computer electronic log that said that McDaniel was on the phone when he left the unit during rounds, whereas McDaniel insisted that she was in the restroom at that time.  In this report, McDaniel stated that she had written numerous incident reports about Williams and that "his behavior and actions" were continuing to create a "hostile work environment" for her.  (Incident Report, Doc. 22-1 at 27.)

After receiving the reports from September 2 and 3, 2013, Johnson directed Major Jason Berchtold, Williams's supervisor, to discuss the issues raised by McDaniel with Williams.  (Johnson Dec.., Doc. 26-1 ¶ 6-7.)  Berchtold submitted an affidavit attesting that he spoke with Williams about the incident reports and told him it was important to maintain professionalism, set aside personal feelings toward other staff, address the officers on the unit while making rounds, and discuss with them any concerns regarding the job.  (Berchtold Dec., Doc. 26-3 ¶ 3; Williams Dep., Doc. 24 at 53-56.)  Johnson instructed his Administrative Assistant, Timothy Brunsman, to have a similar conversation with McDaniel.  (Johnson Dec., Doc. 26-1 ¶ 6.)  Johnson also instructed Captain Payton to discuss with Williams the protocol of writing comments in the logbook.  (*Id.* ¶ 7.)

Finally, McDaniel filed an incident report on September 9, 2013 concerning an incident that took place on September 2, 2013.  (Incident Report, Doc. 22-1 at 28.)  When she began her shift, McDaniel was briefed by the outgoing officer, Sergeant Hoosier, that there was an issue among three inmates on the unit that might escalate.  (*Id.*)  Before her shift ended, Hoosier took one of the three inmates with her to speak to Williams, and shortly thereafter Williams called the unit and asked her to send the other two inmates to his office separately.  (*Id.*)  After these discussions, the three inmates were sent back to McDaniel's unit.  (*Id.*)  Williams never called McDaniel to report on the results of the conversations or apprise her of any potential security concerns.  (*Id.*; Williams Dep., Doc. 24 at 80-81.)  Johnson received this incident report on the day it was filed and instructed Berchtold to contact Williams and instruct him to how handle such a situation in the future in order to ensure staff and inmate security.  (Johnson Dec., Doc. 26-1 ¶ 8.)

To Williams's knowledge, no other officers have filed complaints or incident reports against him except for an incident in June 2013 when several officers reported an incident relating to Williams's discussion of contraband during a roll call, which resulted in a "corrective counseling" for proper use of word selection during roll call.  (McDaniel Dep., Doc. 22 at 41; Williams Dep., Doc. 24 at 68, 13-14.)

On September 4, 2013, at the direction of Johnson, Brunsman met with McDaniel about the September 2 and 3 incident reports.  (McDaniel Dep., Doc. 22 at 164.)  Brunsman told McDaniel that both she and Williams were being unprofessional.  (Brunsman Dec., Doc. 26-2 ¶ 3.)  He stated that he had watched the security cameras on the unit and it was apparent that both of them were refusing to communicate with the other.  (*Id.*)  He also told her that she could talk to her Unit Manager, Ms. Ester, about any possible safety concerns as they arose and explained

to her that Berchtold would also address Williams's behavior with him.  (*Id.* ¶ 4.)  Later that day, McDaniel began to feel ill and went to the infirmary to be examined.  She reported a headache, nausea, and tingling in her fingers and was sent home for the day.  (McDaniel Dep., Doc. 22 at 164-65; Medical Exam Report, Doc. 22-1 at 47.)

McDaniel later returned to work but her last day of work was September 11, 2013.  (McDaniel Dep., Doc. 22 at 166.)  On that same day, Johnson made the decision that due to the totality of the circumstances in Williams and McDaniel's relationship, he would separate the two of them and Williams would no longer supervise McDaniel but would be reassigned as a supervisor on Zone A.  (Johnson Dec., Doc. 26-1 ¶ 10; Williams Dep., Doc. 24 at 68-69.)  Shortly after September 11, 2013, McDaniel applied for and received a year of disability leave by the Ohio Department of Administrative Services.  (McDaniel Dep., Doc. 22 at 213-14.)  She also subsequently filed an additional grievance pursuant to her collective bargaining agreement, alleging that Williams had harassed her and falsified her log book.  (Grievance Form, Doc. 22-1 at 60.)  The grievance was denied.  (*Id.* at 63.)

### B.  Procedural History

McDaniel filed four charges of discrimination with the Ohio Civil Rights Commission on September 6, 2013 and September 18, 2013, all of which she subsequently withdrew.  (McDaniel Dep., Doc. 22 at 220-21, 231-33.)  Next, she filed a charge of race and sex discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 4, 2013, and the EEOC issued her a right-to-sue letter on November 6, 2013.  (*Id.* at 227-28.)  On January 31, 2014, Plaintiff filed a complaint in this Court asserting causes of action for:  (1) disparate treatment on the basis of her race under Title VII; (2) disparate treatment on the basis of her sex in violation of Title VII; (3) retaliation for her protected conduct of filing internal complaints

against her supervisor, in violation of Title VII; (4) unlawful invasion of privacy and assault under Ohio law.  (Compl., Doc. 1 at 4-6.)  She seeks injunctive relief, compensatory damages, punitive damages, and attorney fees and costs.  (*Id.* at 6.)  After the parties conducted discovery, Defendant moved for summary judgment on all causes of action.  (Doc. 26.)  Plaintiff opposes dismissal of all claims but her state-law claims, which she concedes should be dismissed without prejudice so that she may refile them in the Ohio Court of Claims.  (Doc. 29 at 19-20.)

### III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).  Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting

*Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

## IV.   ANALYSIS

### A. Race and Sex Discrimination

Title VII prohibits an employer from discriminating against any individual based on that individual's race, sex, or other protected characteristic. *See* 42 U.S.C. § 2000e-2(a)(1); *Shazor v. Prof'l Transit Mgmt.*, Ltd., 744 F.3d 948, 955 (6th Cir. 2014). A plaintiff may prove disparate treatment on the basis of race or sex in two ways: direct evidence of discrimination or circumstantial evidence that creates an inference of discrimination. *Id.* Here, McDaniel has not introduced direct evidence of disparate treatment or harassment on the basis of race or sex. Therefore, the Court applies the burden-shifting framework for circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, Plaintiff must make a prima facie case of discrimination by showing that: (1) she was a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the job; and (4) for the same or similar conduct, she was treated differently from similarly situated employees outside the protected class. *See id.* at 802; *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Brathwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). After the defendant meets its

burden, the plaintiff must then demonstrate that the defendant's explanation was a pretext for discrimination. *Id.* The burden to show pretext requires a plaintiff only "to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (internal quotation marks and citation omitted). A plaintiff may demonstrate pretext by showing that the proffered nondiscriminatory reasons had no basis in fact, were insufficient to motivate the action taken, or did not actually motivate the adverse action. *Harris v. Metro. Gov't of Nasvhille & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

Defendant does not contest that Plaintiff satisfies the first and third elements of the prima facie case for race and sex discrimination because she is an African-American woman and was qualified for her position. Defendant argues, however, that McDaniel was not subjected to an adverse employment action and was not treated differently from white or male employees. (Doc. 26 at 19-24; Doc. 30 at 5-7.) Defendant further argues that even if Plaintiff has made a prima facie case, she cannot show that Defendant's nondiscriminatory reasons for the adverse employment action were pretext for discrimination.

### 1.  *Prima Facie Case*

#### a.  Adverse Employment Action

Defendant first argues that McDaniel was not subjected to an adverse employment action. A plaintiff "suffers an adverse employment action where there is: (1) a termination of employment; (2) a demotion resulting in loss of benefits or salary reduction; (3) conferring of a less distinguished title; (4) a material loss of benefits; (5) significantly diminished material responsibilities or (6) other factors unique to the particular situation." *Jones v. Butler Metro. Housing Auth.*, 40 F. App'x 131, 136 (6th Cir. 2002) (citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). The Sixth Circuit has held, in unpublished opinions, that a

written reprimand is not an adverse employment action "without evidence that it led to materially adverse consequences such as lowered pay, demotion, suspension, or the like." *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012).  *See also Lahar v. Oakland Cnty.*, 304 F. App'x 354, 357 (6th Cir. 2008) (holding that the plaintiff did not produce any evidence that reprimands and lowered evaluations reduced, or were likely to reduce, her compensation or further advancement); *Howard v. Bd. of Educ. of Memphis City Sch.*, 70 F. App'x 272, 280 (6th Cir. 2003) (finding that racially insensitive comments, verbal reprimands, and inconvenient and disruptive changes like the reassignment of a teacher from her classroom did not "individually or collectively" constitute an adverse employment action); *Jones* 40 F. App'x at 137 ("Unless the letter [of reprimand] accompanied some other action, such as a demotion or salary reduction, it is not an adverse employment action.").

Like the plaintiffs in these cases, McDaniel fails to show that the search to which she was subjected during the staff shakedown was an adverse employment action.  Taking the facts in the light most favorable to McDaniel as required on summary judgment, Workman instructed McDaniel to remove her uniform shirt and lift up the t-shirt she was wearing over her bra. (McDaniel Dep., Doc. 22 at 78-81.)  Workman then touched the back of her bra strap, stated that she agreed that the bra contained metal, and left the restroom.  (*Id.* at 81-82.)  Even if Workman violated the staff shakedown policy in asking McDaniel to expose her bra and touching it, McDaniel did not suffer any loss of material benefits, responsibilities, or title as a result of this incident, and, therefore, it did not constitute an adverse employment action.

Plaintiff also argues that even if the written reprimand and staff shakedown did not constitute adverse action, she can show that she was constructively discharged, which is prohibited under Title VII.  *See Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 770 (6th Cir.

2008); *see also Cook v. Liquid Container, Inc.*, No. 1:08-CV-167, 2009 WL 3682285, at *6 (S.D. Ohio Nov. 2, 2009).  To establish a claim of constructive discharge, a plaintiff must show that: "(1) the defendant deliberately created intolerable working conditions, as perceived by a reasonable person; and (2) the defendant did so with the intention of forcing the plaintiff to quit." *Lindsey*, 295 F. App'x at 770 (citing *Logan v. Denny's Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001)).  A constructive discharge occurs when "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Smith v. Henderson*, 376 F.3d 529, 533-34 (6th Cir. 2004) (internal quotation marks and citation omitted).  The Sixth Circuit has adopted a multi-factor test to evaluate the first prong of the constructive-discharge inquiry:

> Whether a reasonable person would have feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569.

Plaintiff contends that she was constructively discharged when she went on disability leave, due to the cumulative effect of the written reprimand, staff shakedown, and Williams's lack of communication with her, which she contends put her in danger from inmates.  (Doc. 29 at 13-14.)  Her argument is unconvincing.  The Sixth Circuit has held that the manner in which a plaintiff is supervised or criticized is normally insufficient to establish a constructive discharge claim.  *Smith*, 376 F.3d at 534 (citing cases where plaintiffs were not deemed constructively discharged despite dissatisfaction with new work assignments or requirement to travel more frequently).  None of the factors enumerated in *Logan* weighs in favor of finding that McDaniel

was constructively discharged.  Even if she suffered "badgering, harassment, or humiliation," there is no evidence that it was "calculated to encourage [her] resignation."  *Logan*, 259 F.3d at 569.  In any event, she has introduced no evidence that any of her working conditions were "deliberately created . . . with the intention of forcing [her] to quit, and thus she cannot establish the second prong of a constructive-discharge claims.  *Lindsey*, 295 F. App'x at 771 (noting that, on the contrary, the defendant actually sought to resolve the issues raised by the plaintiff).  McDaniel has failed to show constructive discharge or any other adverse action.

### b.  Similarly Situated Non-Class Members

Even if the staff shakedown or written reprimands did constitute adverse employment actions, McDaniel is still unable to make a prima facie case of discrimination because she has not introduced evidence to show that she was treated differently than similarly situated white or male employees.  McDaniel points to no evidence that white or male employees did not receive written reprimands for the same or similar conduct as the phone room door incident.  Indeed, she makes no allegations about the race or gender of other officers and does not discuss their conduct or treatment by Williams at all, other than to state that she did not remember any other corrections officers discussing grievances against Williams, specifically naming Officers Miller, Hogan, Dewees, and other union members on her shift.  (McDaniel Dep., Doc. 22 at 41.)  A plaintiff cannot establish a prima facie case with generalized allegations of differential treatment; she bears the burden to produce evidence of similarly situated employees outside the protected class who were treated differently than she.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) ("[T]the plaintiff [must] demonstrate that he or she is similarly-situated to [a] non-protected employee in all *relevant* respects.") (emphasis in original); *see also Mitchell*, 964 F.2d at 583 ("Plaintiff's allegations regarding other employees not being

16

fired for different, but what she subjectively believes to be more serious, misconduct simply does not satisfy [this element of the prima facie case].").

As to the staff shakedown, although in her deposition McDaniel named three white women on Zone A who were permitted to pass through inspection without having to lift up their shirts, she offers no evidence beyond her own hearsay testimony and the union grievance form, which she filed on August 20, 2013.  (*See* McDaniel Dep., Doc. 22 at 86; Grievance Form, Doc. 22-1 at 48.)  She suggested that she had learned this information from the union steward on Zone B who had conferred with the union steward on Zone A, but she did not submit any testimony from the three officers or the union stewards to corroborate her assertion.  (*See* McDaniel Dep., Doc. 22 at 87-89.)  In the same vein, the grievance form contains no direct accounts from any witnesses to the shakedown on Zone A, but only a statement that McDaniel and the union believed that management had violated the union contract by requiring McDaniel to expose her bra to Workman but waving through three white females who did not clear the metal detector. (Grievance Form, Doc. 22-1 at 48.)  Therefore, McDaniel has failed to satisfy both the second and fourth prongs of the prima facie case.

## 2.  *Pretext*

Defendant contends that McDaniel has not introduced any evidence to suggest that DRC's proffered nondiscriminatory reasons for issuing a written reprimand or ordering her to be searched during the staff shakedown were pretextual.  Although the Court need not reach the issue of pretext because McDaniel has failed to make out a prima facie case of race or sex discrimination, the Court finds that McDaniel has not shown pretext.

Defendant's proffered nondiscriminatory reason for the reprimand of McDaniel was her insubordination to Williams.  McDaniel offers no explanation for why the charge of

insubordination was actually pretext for discrimination. Even if the Court assumes that the written reprimand is an adverse employment action, issuing a written reprimand to an employee (and taking no further disciplinary action) is a proportional response to disregarding an order from a supervisor. Therefore, she cannot show that the proffered reason of insubordination "had no basis in fact" or was "insufficient to motivate" the issuance of the reprimand. *See Harris*, 594 F.3d at 486. Moreover, she has not offered any evidence that Johnson's written reprimand was actually motivated by some other factor besides insubordination. *See id.*

Defendant's proffered nondiscriminatory reason for McDaniel's treatment during the staff shakedown was that it was necessary for DRC to detect contraband entering MaCI and that DRC's policy was reasonable. (Doc. 30 at 9-10.) McDaniel has similarly not raised a factual dispute as to whether this proffered reason was pretext for discrimination. She maintains that "a special shakedown involving a metal detector was most unusual, and it was not likely to detect any contraband." (Doc. 29 at 17.) But the only evidence in the record regarding the frequency of the staff shakedowns is the Standardized "Shakedown Protocol," which mandates that such shakedowns take place at least twice per year, as well as deposition testimony indicating that the shakedowns are as often as once per quarter and even that McDaniel herself had previously been subject to a shakedown. (Standardized "Shakedown Protocol," Doc. 22-1 at 30; McDaniel Dep., Doc. 22 at 74.) Additionally, as discussed above, despite McDaniel's insistence that three white women were not subject to an additional individual screening when they set off the metal detector, McDaniel has failed to introduce any evidence to corroborate her hearsay testimony about what happened to these three women.

Because Plaintiff has failed to make out a prima facie case or, in the alternative, to show pretext, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's race and sex discrimination claims.

### B.  Retaliation Claim

Under Title VII, it is unlawful for an employer to "discriminate against . . . [an] employee . . . because [the employee] has opposed any [unlawful] employment practice, or because [the employee] has made a charge" that the employer has engaged in an unlawful employment practice."  42 U.S.C. § 2000e-3(a).  "Unlawful employment practices under Title VII include any actions taken on the basis of race, color, religion, sex, or national origin that 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment.'"  *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 543 (6th Cir. 2008) (quoting 42 U.S.C. § 2000e-2(a)(1)).

A plaintiff who alleges retaliation may establish the claim through direct or circumstantial evidence.  *Id.* at 543.  If a plaintiff relies on only circumstantial evidence, as is the case here, she must produce evidence of a prima facie case of retaliation by showing that:  (1) she engaged in protected activity; (2) Defendant was aware that Plaintiff had engaged in protected activity; (3) after Plaintiff engaged in the protected activity, Defendant took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015).  The Supreme Court has held that the fourth prong of the test "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).

If the plaintiff produces enough evidence to make a prima facie case of retaliation, the burden shifts to the defendant to produce evidence of a legitimate, nonretaliatory reason for its action.  *Yazdian*, 793 F.3d at 650.  If the defendant meets that burden, then the plaintiff must produce evidence to show that the defendant's reason is pretext for retaliation.  *Id.*  As in a discrimination claim, the plaintiff may establish pretext "by showing (1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate his [termination], or (3) that they were *insufficient* to motivate discharge."  *Id.* at 651 (alteration and emphases in original) (internal quotation marks and citation omitted).

Although Plaintiff's retaliation claim is not altogether clear, it appears that she alleges that DRC retaliated against her after she filed an incident report about the phone room door incident, which she apparently argues is protected activity.  (Doc. 29 at 18-19.)  Plaintiff cites the following "retaliatory acts" committed by the employer in response to her protected activity:  (1) Williams doubling back on rounds to make the point to her that he was in charge; (2) the staff shakedown where she was forced to expose her bra; (3) the written reprimand that DRC issued to McDaniel for the phone room door incident; and (4) Williams's failure to communicate with McDaniel throughout August and September even though such lack of communication was contrary to DRC's rules.  (*Id.* at 18-19.)

Defendant contends that Plaintiff's retaliation claim must be dismissed because McDaniel was not subject to an adverse employment action and did not engage in protected activity prior to the staff shakedown or the receipt of her written reprimand.  (Doc. 26 at 24-25.)  The Court will first turn to the question of whether McDaniel has made out a prima facie case by introducing evidence that she engaged in protected activity and was subject to a materially adverse employment action.

*1. Prima Facie Case*

a.  <u>Protected Activity</u>

A plaintiff may show that she has opposed an unlawful employment practice through the filing of formal discrimination charges with the EEOC but also through complaints to management and less formal means.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).  The incident report after the phone room door incident did not contain any complaints of discrimination on the basis of race, sex, or any other protected class, or of any other purported unlawful activity.  (Incident Report, Doc. 22-1 at 22-23.)  It did not include even a "vague charge of discrimination," which in itself would fall short of protected activity.  *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989).  Nor does McDaniel allege that she informally complained to coworkers or other managers about discriminatory conduct. *See Yazdian*, 793 F.3d at 647 ("[P]rotected activity includes complaints to co-workers."). Although she later stated in deposition and in her affidavit that she believed Williams treated her differently based on her race and sex, in particular because she was a black woman engaged to a white man, she has not introduced any evidence that in the incident report or the subsequent investigation she raised the subject of race or sex discrimination or any other unlawful employment practice. Therefore, the filing of the incident report after the phone room door incident does not constitute protected activity.

b.  <u>Materially Adverse Action</u>

Even if McDaniel could show that she engaged in protected activity, she cannot show that she was subject to a materially adverse action.  The "'materially adverse action' element of a Title VII retaliation claim is substantially different from the 'adverse employment action' element" of a Title VII discrimination claim.  *Laster*, 746 F.3d at 719 (citing *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006)).  Plaintiff's burden to establish a materially

adverse employment action is "less onerous in the retaliation context than in the anti-

discrimination context."  *Id.* at 731 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d

584, 595-96 (6th Cir. 2007)).  An action is materially adverse when it "could well dissuade a

reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*,

548 U.S. at 57.  Whether an employer's action is materially adverse "depends upon the

circumstances of the particular case, and should be judged from the perspective of a reasonable

person in the plaintiff's position, considering all the circumstances."  *Id.* at 71 (internal quotation

marks omitted).

The Sixth Circuit has held that a lowered evaluation could "dissuade[ ] a reasonable

worker from making or supporting a charge of discrimination" if it "significantly impact[s] an

employee's wages or professional advancement."  *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F.

App'x 424, 432, 433 (6th Cir. 2007) (internal quotation marks omitted).  In a case where

reprimands and lowered evaluations did not reduce a plaintiff's pay or change her title, and she

offered no evidence that her future prospects would be diminished, however, the plaintiff could

not show a materially adverse employment action.  *Lahar*, 304 F. App'x at 357.  And in *Taylor*

*v. Geithner*, the Sixth Circuit held that "[a]lthough certain written reprimands could rise to the

level of [a materially] adverse employment action, the written reprimands given here would not

have dissuaded a reasonable worker from making a claim of discrimination" because there was

"no evidence in the record that any disciplinary action resulted from these letters, or that these

letters were related to a larger pattern of intimidation by constantly reprimanding [the plaintiff],

for example."  703 F.3d 328, 338 (6th Cir. 2013).  In *Taylor*, the two reprimands consisted of

warnings that contacting upper management in lieu of following the chain of command and talking on a cell phone in a work area could lead to further disciplinary action.  *Id.*

Similarly, McDaniel—who was subject to only one reprimand and no negative evaluations—offers  no evidence that there was a pattern of reprimands, that further discipline resulted from the reprimands, or that the reprimand would diminish her future prospects.  And if the written reprimand does not rise to the level of a materially adverse employment action, nor do the other examples McDaniel cites, including Williams doubling back to check on her during rounds or failing to communicate with her.  *See Burlington Northern*, 548 U.S. at 68 ("[C]ourts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and coworkers are not actionable.").  Nor can the staff shakedown be considered materially adverse, because McDaniel has offered no evidence that it could have affected her wages, professional advancement, or other future prospects, or that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted).  Plaintiff has not made out a prima facie case of retaliation.

### 2.  *Pretext*

Defendant contends that even if McDaniel did engage in protected activity and DRC did take a materially adverse employment action against her, she cannot show pretext.  (Doc. 26 at 25-27.)  Plaintiff's response brief does not address the issue of pretext on the retaliation claim. For the same reasons as detailed above in the discussion of pretext on her discrimination claim, Plaintiff has not shown that Defendant's legitimate reasons for issuing her a written reprimand (insubordination) or conducting the staff shakedown (detection of contraband) were pretextual.

The Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim.

### C. Harassment Claim

To make out a prima facie case for a claim of hostile work environment on the basis of race or sex, McDaniel must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her race or sex; (4) the harassment created a hostile work environment; and (5) the employer was vicariously liable for the harassment. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347-48 (6th Cir. 2005). Defendant contends that Plaintiff cannot satisfy the third, fourth, or fifth prong of the test.

#### 1. *Harassment on the basis of race or sex*

Again, it is undisputed that Plaintiff is a member of a protected class. Even if the Court accepts that Plaintiff has been subject to unwelcome harassment, Plaintiff cannot point to any facts showing that the harassment was based on race or sex and created a hostile work environment. Like her discrimination claim, she fails to introduce any material evidence that this treatment was based on race or sex beyond her own testimony that she thought that McDaniel began treating her differently when he found out she was engaged to a white man. Similarly, she offers no evidence to show that she was targeted based on her sex or race when Harris sent her to the restroom and Workman instructed her to lift up her t-shirt after she set off the metal detector. The incident at the staff shakedown could be construed as harassment on the basis of race or sex if McDaniel could show that white or male employees were treated differently after they set off the metal detectors. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (holding that a plaintiff may prove that harassment was based on protected status through comparative evidence about how the alleged harasser treated members and non-members of the

protected class); *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011).  But this option is unavailable to McDaniel because she has not offered any witness testimony to support her contention that the three white female officers working on Zone A that evening were not subject to the same treatment as she was.

### 2.  *Hostile Work Environment*

Even if these instances and the others cited by McDaniel did, in fact, constitute harassment, they almost certainly were not severe or pervasive and, therefore, cannot constitute a hostile work environment.  A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).  This prong requires that the work environment be both "objectively hostile or abusive" and also that the victim "subjectively perceive the environment to be abusive."  *Id.* at 21-22.  Courts must examine all the circumstances surrounding the harassment in order to determine if it is objectively hostile, including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.

McDaniel's testimony likely suffices to establish the subjective prong of the test, but she cannot show that the work environment was objectively hostile.  Perhaps the staff shakedown incident was "physically . . . humiliating," *Harris*, 510 U.S. at 23, if other officers were not subject to this treatment, particularly because, taking McDaniel's testimony as true, it appears to be a violation of the DRC staff shakedown policy, which states that:  "Unless there is 'reasonable suspicion' for a more thorough search, employees should not be required to remove

socks/stockings, or expose/manipulate undergarments in any way." (Standardized "Shakedown Protocol," Doc. 22-1 at 30.) But certainly it was not frequent, given that it happened only once, and "[i]solated incidents, . . . unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000)). Given that the search was conducted in private by a female manager, and that Workman touched only the back of McDaniel's bra—though she also did look at her bra from the front—this was not an "extremely serious" incident in the prison employment context, where searches are routine and necessary to ensure detection of contraband.

Because Plaintiff cannot establish that she was harassed on the basis or her race or sex or that the alleged harassment was severe or pervasive, her harassment claim fails at the prima facie stage. The Court need not reach the question of whether Defendant was vicariously liable for the harassment. *Clark*, 400 F.3d at 347-48. The Court **GRANTS** summary judgment to Defendant on McDaniel's harassment claim.

### D. State Claims

Plaintiff concedes that her state law claims should be dismissed. The State of Ohio has not waived its sovereign immunity to suit in federal court as to Ohio law claims. The State has waived sovereign immunity only as to Ohio claims filed in the Court of Claims of Ohio. *See* Ohio Rev. Code § 2743.02. Defendant's Motion for Summary Judgment on Plaintiff's state claims is **GRANTED**.

## V.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment on all claims.  Plaintiff's state-law claims for unlawful invasion of privacy and assault are **DISMISSED without prejudice**.  All other claims are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

    ___/s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  December 4, 2015**